UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RUMFISH Y VINO CORPORATION,
*et al.*,

        Plaintiffs,

v.                                                    Case No. 8:19-cv-595-T-36AEP

FORTUNE HOTELS, INC.*, et al.*,

        Defendants.

_____/

## **REPORT AND RECOMMENDATION**

      Rumfish Y Vino Corporation ("RYV") and JPL Partners #1 LP ("JPL1") (collectively, "Plaintiffs")[1] brought this action alleging claims for actual and anticipatory breach of contract, trademark infringement, false designation of origin and false representation regarding trademarks, declaratory relief, and cancellation of trademarks (Doc. 1).  Contemporaneously with the filing of their Complaint, Plaintiffs filed motions seeking both a temporary restraining order and a preliminary injunction against Defendants Fortune Hotels, Inc., Ria-Sandpiper, Inc., and Resort Inns of America, Inc. d/b/a TradeWinds Island Resorts (collectively, "TradeWinds") (Docs. 2 & 3).[2]  Upon review, the district judge denied Plaintiffs' request for a temporary restraining order (Doc. 12).  By the instant motion, Plaintiffs seeks entry of a preliminary injunction enjoining TradeWinds from, among other things, using the term "RUMFISH" in conjunction with a rebranding related to a TradeWinds resort property and related businesses

---

[1] John Solomon and Pamela Solomon (the "Solomons") are the sole owners of RYV and co-owners of JPL1 with two partners (Doc. 2-2, Declaration of Pamela Solomon ("Solomon Decl."), at ¶3).

[2] Plaintiffs also asserts claims against "Does 1-10" in this action, which have not yet been specifically identified.

in purported violation of a Consent and Settlement Agreement entered into by the parties (Doc. 17).[3]  TradeWinds opposes Plaintiffs' request, arguing that Plaintiffs cannot demonstrate a likelihood of success on the merits of their claims, Plaintiffs will not suffer irreparable harm, the harm that TradeWinds will suffer if a preliminary injunction issues exceeds any harm that Plaintiffs will experience if a preliminary injunction is denied, and the public interest will not be served by entry of a preliminary injunction (Doc. 39).  After consideration, and for the reasons set forth below, it is recommended that Plaintiffs' amended motion for preliminary injunction (Doc. 17) be denied.[4]

## I.      Background

In 2008, the Solomons visited Belize and decided to open a restaurant and bar in a location they found during that trip (Solomon Decl., at ¶¶4-5).  After some discussion with friends, the Solomons decided on the term "RUMFISH" as the name of their new venture (Solomon Decl., at ¶5).  RYV opened the "RUMFISH y vino" restaurant in Placencia, Belize, and has owned and operated it continuously since November 2008 (Solomon Decl., at ¶3).  In addition, JPL1 owns and operates the "RUMFISH y vino" restaurant in Ventura, California, and has done so continuously since November 2016 (Solomon Decl., at ¶3).  In conjunction with its "RUMFISH y vino" restaurant, the Solomons operate a website at www.rumfishyvino.com and have done so since around October 2009 (Solomon Decl., at ¶9).

---

[3]  Given the denial of the temporary restraining order, Plaintiffs' filed an amended motion for preliminary injunction removing references to the motion for temporary restraining order (Doc. 17).  As a result, the undersigned denied the original motion for preliminary injunction as moot (Docs. 3 & 19) and only the amended motion seeking a preliminary injunction remains pending (Doc 17).

[4]  The district judge referred the matter for issuance of a Report and Recommendation (Doc. 14).  *See* 28 U.S.C. § 636; M.D. Fla. R. 6.01.

In addition, RYV maintained a Facebook page for its Belize restaurant and bar, which it operated and regularly updated since around April 2010 (Solomon Decl., at ¶9 & Ex. F).

Following that, in May 2012, TradeWinds entered into a licensing agreement with Guy Harvey Outpost and rebranded one of TradeWinds' former hotels as the Guy Harvey Outpost (Doc. 39, Ex. 1, Declaration of Keith Overton ("Overton Decl."), at ¶5). After the rebranding, TradeWinds decided to open a new restaurant at the Guy Harvey Outpost and began discussions planning the concept for the restaurant (Overton Decl., at ¶5). To that end, in February 2013, TradeWinds contends that it coined the term "RumFish" while brainstorming possible names for its new restaurant at the TradeWinds Island Resort ("TradeWinds Resort") without any prior knowledge of RYV or the "RUMFISH y vino" mark (Overton Decl., at ¶¶4 & 6-11). Indeed, a February 26, 2013 e-mail from Mark Ellert, President of Guy Harvey Outpost, to TradeWinds representatives indicates that the term "Rumfish" was listed as a preference from a list of options for the new restaurant concept (Overton Decl., at ¶6 & Ex. A). Eventually, TradeWinds decided to use "RumFish Grill" as the name for its new restaurant concept (Overton Decl., at ¶¶6-7). At the time TradeWinds made this decision, TradeWinds asserts that it did not discuss the name with anyone named Hugh Darley or anyone affiliated with Norwegian Cruise Lines and was not aware of any restaurants or businesses named "RUMFISH" or "RUMFISH Y VINO" in Belize (Overton Decl., at ¶9-10). In fact, TradeWinds contends that it was not aware of any third parties using any "RUMFISH" marks in the United States when it selected the mark in early 2013, and no U.S. trademark filings existed for any "RUMFISH" marks at that time (Overton Decl., at ¶11). TradeWinds aimed to open the RumFish Grill restaurant in May 2014 (Overton Decl., at ¶7). In furtherance of that goal, TradeWinds purchased the domain name www.rumfishgrill.com on March 14, 2013 (Overton Decl., at ¶8 & Ex. B).

Meanwhile, in early 2013, a California-based hotel group approached the Solomons regarding expansion of their restaurant (Solomon Decl., at ¶10).  The Solomons considered entering into a deal with the California-based hotel group.  Ultimately, however, the Solomons decided they did not want to connect themselves with a hotel chain (Solomon Decl., at ¶10).  Notwithstanding, later that year, on October 7, 2013, RYV filed U.S. Trademark Application Serial No. 86/084,571 seeking to register the service mark "RUMFISH y vino" for bar and restaurant services based on actual use (Solomon Decl., at ¶11 & Ex. N; *see* Doc. 39, Ex. 2, Declaration of James David Johnson ("Johnson Decl."), at ¶4 & Ex. G).  RYV later petitioned the United States Patent and Trademark Office ("USPTO") on May 8, 2014 to fix the application based upon an intention to use rather than actual use, and the petition was later granted on August 7, 2014 (Solomon Decl., at ¶12 & Ex. N).

In early 2014, TradeWinds began marketing and advertising "RumFish Grill" and created a Facebook page on February 18, 2014 (Overton Decl., at ¶¶12-13 & Exs. C & D).  The first week of April 2014, TradeWinds issued a press release, which it issued and disseminated nationwide, regarding the opening of "RumFish Grill" in May 2014 (Overton Decl., at ¶13 & Ex. E).  Around that time, during the spring of 2014, the Solomons learned that an entity planned to open a restaurant and bar called "Guy Harvey's RumFish" in May 2014 (Solomon Decl., at ¶14).  Following that, on April 11, 2014, RYV filed U.S. Trademark Application Serial No. 86/249,678 for the service mark "RUMFISH" for bar and restaurant services based on intent to use (Solomon Decl., at ¶16 & Ex. O).  RYV's counsel then contacted TradeWinds later that month and informed TradeWinds of the pending U.S. trademark applications RYV filed for the "RUMFISH" and "RUMFISH Y VINO"  marks and setting forth a demand for $500,000 for the right to use the "RUMFISH" mark in the United States, despite not operating a restaurant in the United States at that time (Johnson Decl., at ¶¶6-7).

4

Shortly thereafter, on May 1, 2014, TradeWinds' counsel sent a letter to Plaintiffs' counsel regarding its refusal to pay $500,000 for use of the mark, raising questions as to Plaintiffs' U.S. trademark applications, and offering terms for a resolution of the matter without court or United States Patent and Trademark Office ("USPTO") involvement (Johnson Decl., at ¶8 & Ex. H).  On the same day, TradeWinds filed U.S. Trademark Application Serial No. 86/269,370 for the trademark and service mark "RUMFISH GRILL" for restaurant and bar services and clothing, including t-shirts, shirts, sweatshirts, hats, and visors, based on an intention to use (Solomon Decl., Ex. P).  Subsequently, Plaintiffs and TradeWinds engaged in a dispute regarding the rights to use and register the "RUMFISH" marks (Solomon Decl., at ¶20).  Following negotiations, the parties entered into a Consent and Settlement Agreement (the "Agreement") effective May 23, 2014, after which TradeWinds paid RYV $30,000 and opened RumFish Grill as planned (Solomon Decl., Ex. C; Overton Decl., at ¶17).  In pertinent part, the Agreement states:

<u>Recitals</u>

***

WHEREAS, the Parties' respective applied-for marks differ in spelling and pronunciation and the Parties believe in good faith that actual confusion is unlikely.  The Parties are unaware of any evidence of actual instances of confusion, and neither Party contemplates expanding its distribution in such a way as to create a likelihood of confusion;

WHEREAS, based on the best information available to the Parties, it appears that RYV Corp. will become entitled to use its RUMFISH Y VINO mark and Fortune will become entitled to use its RUMFISH GRILL mark in the United States as a result of their future lawful use in commerce in connection with such services and goods in such a manner that confusion, mistake or deception would not likely result from such continued use.

***

1.      **Consent to Registration.**   RYV Corp. acknowledges Fortune's ownership of and right to use and register in the United States its RUMFISH GRILL mark, its GUY HARVEY RUMFISH GRILL mark, and other word and

design marks that are variations and iterations of the foregoing (collectively, "Fortune's Marks") in connection with restaurant services, bar services, and clothing in International Classes 25 and 43. RYV Corp. hereby gives its consent to registration of the mark RUMFISH GRILL in and with the USPTO under Application Serial No. 86/269,370, as well as the registration of its GUY HARVEY RUMFISH GRILL mark, and other marks that are variations and iterations of the foregoing with the USPTO and/or any state trademark agency. RYV Corp. requests that the USPTO register Fortune's Marks. In the event that RYV Corp. fails to use its RUMFISH Y VINO mark with bar services and/or restaurant services in commerce as a service mark in the United States commencing on or before five (5) years after the Effective Date of this Agreement (the foregoing being hereafter referred to as "RYV's U.S. Use Requirement" and the aforementioned period of time for RYV Corp. to begin use in commerce in the United States being hereafter referred to as "the US Restricted Period"), RYV Corp. further acknowledges and consents to Fortune's right to use and register in the United States the word RUMFISH, by itself, and words and phrases that are variations and iterations of the foregoing. For purposes of this Section, use in commerce as a service mark by RYV Corp. shall not include analogous use, i.e., use that is analogous to but that is not use of RUMFISH Y VINO as a service mark, and such use in commerce must be continuous and ongoing in the United States from the date it commences.

2. **Consent to Registration.** Fortune acknowledges RYV Corp.'s ownership of and right to use and register in the United States its RUMFISH Y VINO mark, and other word and design marks that are variations and iterations of the foregoing (collectively "RYV's Marks") in connection with bar services and restaurant services in International Class 43. Fortune hereby gives its consent to registration of the mark RUMFISH Y VINO in and with the USPTO under Application Serial No. 86/269,370, as well as any other application for RUMFISH Y VINO, and other marks that are variations and iterations of the foregoing filed by RYV Corp. with the USPTO and/or any state trademark agency. Fortune requests that the USPTO register RYV's Marks. For purposes of this Section, and irrespective of whether or not RYV Corp. achieves use in commerce of RUMFISH Y VINO before expiration of the U.S. Restricted Period, RYV Corp. has indefinite rights to register the RUMFISH Y VINO mark (and other word or design marks that are variations and iterations thereof provided that such other word or design marks that are variations and iterations of RUMFISH Y VINO do not cause actual confusion or create a likelihood of confusion with, or otherwise infringe and/or dilute, any mark that Fortune may begin using after expiration of the U.S. Restricted Period).

3. **Covenants of Fortune.** Fortune agrees that it will not utilize the words and phrases RUMFISH, RUMFISH BAR, RUMFISH WINE, RUMFISH AND WINE, and/or RUMFISH Y VINO in connection with restaurant and bar services in the United States. Fortune also agrees any and all uses of the term "Rumfish" must be used in connection with and immediately followed by the term "Grill." The foregoing restrictions shall also apply within the Caribbean Territory as that term is defined in and subject to the terms of Section 8 of this

6

Agreement.  Fortune further covenants and agrees that it will not file a lawsuit against RYV Corp. related to the Dispute; provided, however, that such covenant and agreement shall not apply to any future dispute between the Parties.  Fortune agrees that it will not challenge the validity or ownership of RYV's Marks in the United States (or in the Caribbean Territory subject to the terms of Section 8 of this Agreement).  Nothing in this Agreement shall restrict Fortune from using or registering any other mark that does not contain the word RUMFISH subject to any prior rights of RYV Corp. or of any third party in and to such other mark.  Notwithstanding any other provision in this Agreement, in the event that RYV Corp. fails to meet RYV's U.S. Use Requirement before expiration of the U.S. Restricted Period, the terms and obligations set forth in this Section shall be void and not binding as to Fortune and its acts and business conduct thereafter, except: (i) with respect to the restrictions involving the Caribbean Territory; and (ii) with respect to the restriction against using RUMFISH WINE, RUMFISH AND WINE, and/or RUMFISH Y VINO, which restriction shall remain valid after expiration of the U.S. Restricted Period.  In the even that RYV Corp. uses any of the Fortune Marks after the Effective Date of this Agreement, Fortune Reserves its right to pursue all claims, causes of action, and legal and equitable remedies, including those related to trademark infringement and dilution, against RYV Corp.

**4.      Covenants of RYV Corp.**  RYV Corp. agrees that it will not utilize the words and phrases RUMFISH, RUMFISH GRILL, RUMFISH GRILLE, GUY HARVEY RUMFISH GRILL, and/or RUMFISH BAR in connection with restaurant and bar services in the United States.  RYV Corp. further covenants and agrees that it will not file a lawsuit against Fortune related to the Dispute; provided, however, that such covenant and agreement shall not apply to any future dispute between the Parties.  RYV Corp. agrees that it will not challenge the validity or ownership of Fortune's Marks in the United States.  Nothing in this Agreement shall restrict RYV Corp. from using or registering any other mark that does not contain the word RUMFISH subject to any prior rights of Fortune or of any third party in and to such other mark.  In the event that Fortune uses any of the RYV Marks after the Effective Date of this Agreement, RYV Corp. reserves its right to pursue all claims, causes of action, and legal and equitable remedies, including those related to trademark infringement and dilution, against Fortune.

**5.      No Likelihood of Confusion and/or Actual Confusion.**  The Parties acknowledge and agree that the Parties' respective marks, when viewed in their entireties, are sufficiently different as to appearance, sound, connotation and commercial impression so that confusion as to the source of the Parties' respective goods, services, and business is unlikely.  The Parties represent that, to the best of their knowledge, there has been no actual confusion between their respective marks.  The Parties agree to actively police their respective marks so as to avoid confusion.  In the event that either Party becomes aware of any actual confusion between their respective marks, the Parties agree to communicate all details of each such instance to each other, and to cooperate reasonably to take

steps to abate the cause of confusion, and to prevent such confusion from occurring again.

(Solomon Decl., Ex. C).  According to TradeWinds, the parties did not place or intend to place any restrictions on the use of any goods and services outside of restaurants and bars, and, in fact, did not even discuss use of the marks outside of restaurants, bars, and clothing (Johnson Decl., at ¶9).

In accordance with the terms of the Agreement, on January 16, 2015, TradeWinds filed U.S. Trademark Application Serial No. 86/505,726 for the trademark and service mark "RUMFISH GRILL" for restaurant and bar services, clothing, and drinkware, including shot glasses, cups, and drink glasses, claiming a first use in commerce date of June 2, 2014 (Solomon Decl., at ¶25 & Ex. R).  On October 13, 2015, TradeWinds' application for "RUMFISH GRILL" was registered as a trademark and service mark for restaurant and bar services and clothing and assigned U.S. Trademark Registration No. 4, 832,829 (Solomon Decl., Ex. B). The "RUMFISH GRILL" trademark registration indicates that the first use of the mark occurred on February 7, 2014 and that the first commercial use of the mark occurred on June 2, 2014 (Solomon Decl., Ex. B).[5]

JPL1 then registered to conduct business in the United States on February 19, 2016 (Johnson Decl., at ¶21 & Ex. L).  After that, in March 2016, the Solomons became aware of a potential violation of the Agreement by TradeWinds (Solomon Decl., at ¶26).  Namely, the Solomons learned of an announcement by Defendants regarding the opening of another location of "Guy Harvey's RumFish Grill" in Tampa International Airport ("TIA"), but they noticed that, even though an announcement regarding the opening of the restaurant correctly indicated

---

[5]  Guy Harvey, Inc. also filed an application on May 9, 2014 seeking to register the service mark "GUY HARVEY RUMFISH" for bar and restaurant services based on an intention to use, but the application later was expressly abandoned (Solomon Decl., Ex. Q).

"RumFish Grill," the artist's rendering of the signage indicated only "Guy Harvey's RumFish" without the term "Grill" included (Solomon Decl., at ¶26).  As a result, RYV's counsel sent a letter to TradeWinds indicating the potential violation of the terms of the Agreement (Solomon Decl., Ex. G).  In response, on March 8, 2016, TradeWinds indicated that the artist's rendering was in error, the name of the restaurant in TIA would be "RumFish Grill," and TradeWinds ensured that the improper rendering was no longer displayed on the website for Delaware North (Solomon Decl., Ex. H).

Later, after registering the domain name for www.rumfishyvinoventura.com in October 2016, JPL1 opened "RUMFISH y vino" in Ventura, California in November 2016, where it has continuously operated since that time (Solomon Decl., at ¶27; Johnson Decl., at ¶21 & Ex. M). After filing a statement of pending use in their trademark application, on January 17, 2017, RYV's application for "RUMFISH Y VINO" was registered as a service mark for bar and restaurant services and assigned U.S. Trademark Registration No. 5,124,613, with the first use and first use in commerce identified as November 8, 2016 (Solomon Decl., at ¶28 & Exs. A & S).

Following that, during the spring and summer of 2018, TradeWinds recognized that its license with Guy Harvey Outpost would expire in March 2019, so it considered several rebranding options, including using RumFish Beach Resort for the resort and RumFish Beach Fishing for its charter fishing services (Overton Decl., at ¶18).  Cognizant of the Agreement, although believing it inapplicable to anything outside of restaurant and bar services and a non-issue given the difference in goods and services and the distance between the entities while not believing Plaintiffs' consent was required, in either August or September 2018, counsel for TradeWinds contacted the Solomons requesting their position on a proposed addendum to the Agreement, wherein TradeWinds would be permitted to use the terms "RUMFISH,"

"RUMFISH BEACH RESORT," and "RUMFISH CHARTERS" for use with clothing, towels, hotel services, resort services, reservation and lodging services, and fishing services (Solomon Decl., at ¶29; Overton Decl., at ¶¶19-21; Johnson Decl., at ¶16).  Over the course of several months, the parties engaged in negotiations regarding a possible addendum and further discussed certain instances where each party did not use the term "RUMFISH" in a manner consistent with the terms of the Agreement (Solomon Decl., at ¶30; Doc. 2-20, Declaration of Michael A. DiNardo ("DiNardo Decl."), at ¶4).  The Solomons and DiNardo believed that the rebranding using "RUMFISH" terms was only a consideration rather than a definite and that, if the parties could not come to an agreement on the addendum, TradeWinds would go in a different direction with their rebranding (Solomon Decl., at ¶30; DiNardo Decl., at ¶4; Doc. 17-1, Supplemental Declaration of Michael A. DiNardo ("DiNardo Supp. Decl."), at ¶8).

In the end, the parties did not agree to an addendum (Solomon Decl., at ¶30).  RYV objected to TradeWinds' use of the "RUMFISH" term with respect to the beach resort and fishing marks (Overton Decl., at ¶22).  Concluding that RYV's objection lacked a valid basis, TradeWinds proceeded with the marks and invested thousands of dollars in the rebranding, which officially launched on March 13, 2019 (Overton Decl., at ¶¶23 &27).  Notwithstanding, during the parties' negotiations, Mrs. Solomon became aware of new pending trademark applications filed in August 2018 (Solomon Decl., at ¶31).  Specifically, she became aware of the following applications: (1) U.S. Trademark Application Serial No. 88/066,454 for the trademark "RUMFISH" for clothing, towels, hotel services, resort lodging services, resort hotel services, providing online reservations and bookings for temporary lodging and accommodations, conducting fishing charters, fishing guide services, organization of fishing competitions, and providing information on recreational fishing based upon an intention to use the mark in commerce (Solomon Decl., at ¶31 & Ex. T); (2) U.S. Trademark Application Serial

No. 88/066,480 for the trademark "RUMFISH BEACH RESORT" for hotel services, resort lodging services, resort hotel services, providing online reservations and bookings for temporary lodging and accommodations, clothing, and towels based upon an intention to use the mark in commerce (Solomon Decl., at ¶31 & Ex. U); and (3) U.S. Trademark Application Serial No. 88/066,500 for the trademark "RUMFISH CHARTERS" for conducting fishing charters, fishing guide services, organization of fishing competitions, providing information on recreational fishing, clothing, and towels based upon an intention to use the mark in commerce (Solomon Decl., at ¶31 & Ex. V).

Then, on February 14, 2019, the Solomons learned of news article and press releases relating to TradeWinds' properties and the cessation of the licensing agreement with Guy Harvey and rebranding of the former Guy Harvey Outpost as "RumFish Beach Resort by TradeWinds" (Solomon Decl., at ¶32; *see* DiNardo Decl., Ex. L). The articles also indicated that TradeWinds intended to launch its "RumFish Beach Life" lifestyle brand and relied upon the "success of our RumFish brand" as a natural progression (DiNardo Decl., Ex. L). The next day, Plaintiffs' counsel, Michael DiNardo ("DiNardo"), sent a cease-and-desist letter to TradeWinds and their counsel (DiNardo Decl., Ex. I). In the letter, DiNardo set forth Plaintiffs' position regarding TradeWinds' planned use of the various marks utilizing the term "RUMFISH" and requesting that TradeWinds cease and desist from any plans to use the term other than followed by the term "GRILL," cease and desist from all future uses of "RUMFISH" that would conflict with the terms of the Agreement, and to pay RYV monetary damages, attorney's fees, and costs associated with TradeWinds' purported infringement and unfair competition (DiNardo Decl., Ex. I). Neither Plaintiffs nor DiNardo received a response from TradeWinds to the February 15th letter (*see* DiNardo Decl., Ex. J).

Shortly thereafter, on March 1, 2019, DiNardo sent TradeWinds a second letter on behalf of Plaintiffs, in which he indicated Plaintiffs' intent to file a lawsuit and seek injunctive relief (DiNardo Decl., Ex. J).  TradeWinds responded to both letters on March 4, 2019, indicating that it believed that its intended use of the new marks did not violate the terms of the Agreement because such marks would not be used in conjunction with bar and restaurant services (DiNardo Decl., Ex. K).  As a result, Plaintiffs filed their five-count Complaint on March 8, 2019, asserting claims for actual and anticipatory breach of contract, trademark infringement, false designation of origin and false representation regarding trademarks, declaratory relief, and cancellation of trademarks against TradeWinds (Doc. 1).

At the same time, Plaintiffs filed their motions seeking a temporary restraining order and a preliminary injunction (Docs. 2 & 3).  Specifically, by the motion for temporary restraining order, Plaintiffs sought an order immediately strictly restraining and enjoining TradeWinds from taking any actions contrary to Plaintiffs' proprietary rights with respect to the protected name and associated marks of "RUMFISH y vino" by preventing TradeWinds from rebranding the Guy Harvey Outpost property as RUMFISH BEACH RESORT; using RUMFISH, RUMFISH BEACH RESORT, RUMFISH CHARTERS, or any name or phrase including "RUMFISH" other than RUMFISH GRILL; and using any of the marks or names identified in connection with the establishment and/or operation of a restaurant, bar, hotel, resort, fishing charter service, or similar hospitality provider (Doc. 2).  Upon consideration of the allegations set forth by Plaintiffs, the Court denied Plaintiffs' motion for entry of a temporary restraining order (Doc. 12).  In doing so, the district judge determined that Plaintiffs did not demonstrate that immediate and irreparable injury would result before Defendants could be heard in opposition, or that an injury was so imminent that notice and a hearing to Defendants would be impractical if not impossible (Doc. 12, at 9).

As with the motion for temporary restraining order, by the amended motion for preliminary injunction, Plaintiffs seek to restrain and enjoin TradeWinds from taking any actions contrary to Plaintiffs' proprietary rights with respect to the protected name and associated marks of "RUMFISH y vino" by preventing TradeWinds from rebranding the Guy Harvey Outpost property as RUMFISH BEACH RESORT; using RUMFISH, RUMFISH BEACH RESORT, RUMFISH CHARTERS, or any name or phrase including "RUMFISH" other than RUMFISH GRILL; and using any of the marks or names identified in connection with the establishment and/or operation of a restaurant, bar, hotel, resort, fishing charter service, or similar hospitality provider (Doc.17).  Plaintiffs contend that they established a likelihood of success on the merits of their claims for actual and anticipatory breach of contract, trademark infringement, and false designation of origin; they will suffer irreparable harm in the form of confusion, loss of sales, loss of goodwill, and monetary damages; the harm to Plaintiffs substantially outweighs any harm to TradeWinds – harm which Plaintiffs contend was self-inflicted by TradeWinds; and an injunction serves the public interest because it would protect the public from being misled as to the source of good and services.  In response, TradeWinds argues that an injunction should not issue because Plaintiff cannot establish a likelihood of success on any of their claims, Plaintiffs will suffer no harm if an injunction does not issue, the balance of harm greatly favors TradeWinds, and the public interest would be disserved by issuance of an injunction.

Following referral by the district judge, the undersigned conducted a hearing on the motion for preliminary injunction.  During the hearing, both parties appeared and presented oral argument.  In addition, the parties addressed several issues raised by the undersigned.

## II.      Standard of Review

The decision to grant or deny a preliminary injunction falls within the discretion of the district court.  *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (citation omitted); *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (citation omitted).  In determining whether a preliminary injunction should issue, the court considers whether the moving party demonstrated (1) a substantial likelihood of success on the merits; (2) irreparable harm to the moving party unless the injunction issues; (3) that the threatened harm to the moving party outweighs the potential harm the proposed injunction may cause the opposing party if the injunction issues; and (4) if issued, the injunction would not disserve or be adverse to the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).  Since a preliminary injunction is an extraordinary and drastic remedy, a court should not issue a preliminary injunction unless the moving party clearly establishes the burden of persuasion as to each of the four prerequisites. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir. 2003).

## III.     Discussion

### A.      Likelihood of Success on the Merits

The first factor in determining whether a preliminary injunction should issue is whether Plaintiffs' can show a substantial likelihood they will prevail on the merits of their claims. Based on the record before the Court, Plaintiffs failed to demonstrate a substantial likelihood of success on the merits of their breach of contract, trademark infringement, and false designation of origin claims.

### i.      Breach of Contract

To prevail on a breach of contract claim in Florida,[6] a party must demonstrate (1) the existence of a valid contract; (2) a material breach of the contract; and (3) damages resulting from such breach.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008).  Neither of the parties dispute the existence of a valid contract between them.  Instead, the parties focus upon the alleged breach or anticipatory breach.

Plaintiffs contend that the breach concerns TradeWinds' rebranding of their resort property using the designations "RUMFISH BEACH RESORT," "RUMFISH BEACH LIFE," "RUMFISH CHARTERS," and "RUMFISH" for hospitality services relating to a hotel, the resort, fishing charters, clothing, and towels.[7]  Plaintiffs argue that such use violates paragraph 3 of the Agreement, which reads, in pertinent part: "Fortune agrees that it will not utilize the words and phrases RUMFISH, RUMFISH BAR, RUMFISH WINE, RUMFISH AND WINE, and/or RUMFISH Y VINO in connection with restaurant and bar services in the United States.  Fortune also agrees *any and all uses* of the term 'Rumfish' must be used in connection with and immediately followed by the term 'Grill'" (Solomon Decl., Ex. C) (emphasis added).[8]  As a

---

[6]  The Agreement dictates that it "will be governed by and construed under the laws of the State of Florida" (Solomon Decl., Ex. C, at ¶20).

[7]  During the hearing, Plaintiffs also asserted that the items on the menus at RumFish Grill contain the term "RUMFISH" without the term "GRILL," which constitutes a continuing breach of the Agreement.  This issue otherwise was not presented in the record, however.  The only reference that could even be construed to address any similar conduct includes a reference by DiNardo in his Declaration, wherein he mentions that, during the discussions surrounding the Agreement in 2018, the parties identified certain minor instances where each party used "RUMFISH" in a manner not entirely consistent with the Agreement (DiNardo Decl., at ¶4).  However, in his Declaration, DiNardo indicated it was his understanding that the parties corrected such minor violations (DiNardo Decl., at ¶4).

[8]  Importantly, during the hearing, TradeWinds stated on the record that it plans to abandon its trademark application for use of the "RUMFISH" mark without any other term attached.

result of the breach of those terms, Plaintiffs contend that they will suffer damages in the form of eroding, diminishing, or blurring of the distinctive nature of their mark.

In turn, TradeWinds argues that Plaintiffs cannot establish a likelihood of success on their breach of contract claim because Plaintiffs misinterpret the terms of the Agreement, specifically the terms set forth in paragraph 3.  According to TradeWinds, Plaintiffs interpretation of the phrase "any and all uses" does not mean "any and all goods and services" as such interpretation would significantly broaden the scope of the Agreement.  Instead, TradeWinds insists that the phrase "any and all uses" simply operates as a modifier for variations of the "RUMFISH" marks described in the preceding sentence and the use of such marks in conjunction with another term for restaurant and bar services.

In considering contract construction and interpretation, Florida courts adhere to the following:

> Words and phrases in a contract should be given their common and ordinary meanings absent specific contractual definitions or if the fact finder decides that the parties intended the words to have a special meaning.  If the language of a contract is susceptible of two constructions, the contract should not be interpreted in a manner that would make it inequitable, unnatural, or leave one party at the mercy of the other.  A reasonable interpretation of a contract is preferred to an unreasonable one.  Any ambiguity in a written agreement must be resolved by interpreting the language against the party who drafted the ambiguous language.

*MDS (Canada) Inc. v. Rad Source Tech., Inc.*, 822 F. Supp. 2d 1263, 1296 (S.D. Fla. 2011) (internal citations omitted) (citing Florida law).  Essentially, "[u]nder Florida law, if the terms of a[] contract are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract."  *Key v. Allstate Ins. Co.*, 90 F.3d

---

Such a declaration and intention weighs against a likelihood of success on the merits of the breach of contract claim.

1546, 1548-49 (11th Cir. 1996) (citations omitted).  The terms of a contract provide the best evidence of the parties' intent, so, where the language is plain, the court should not create confusion by adding any hidden meanings, terms, conditions, or unexpressed intentions.  *Id.* (citations omitted).

In this instance, when read in its entirety, the Agreement appears to pertain to the use of the "RUMFISH" marks solely in relation to restaurant and bar services (*see* Solomon Decl., Ex. C).  The Agreement does not reference any other goods or services subject to its terms and conditions.  Furthermore, if the restriction set forth in the second sentence of paragraph 3 applied to every use of the "RUMFISH" mark relating to any good or service offered by TradeWinds, as Plaintiffs suggest, such an interpretation would render the first sentence entirely meaningless.  Rather, the most reasonable interpretation of the plain language of the second sentence of paragraph 3 of the Agreement would be that the phrase "any and all uses" pertains to TradeWinds' use of the "RUMFISH" mark in connection with its restaurant and bar services, not every potential good or service TradeWinds might offer.  Furthermore, to the extent that any ambiguities exist in the interpretation of the phrase "any and all uses" in paragraph 3, the resolution of such interpretation would be resolved against Plaintiffs as the parties who drafted the language (*see* Johnson Decl., Ex. J).  *MDS (Canada)*, 822 F. Supp. 2d at 1296; *cf. LSQ Funding Grp., L.C. v. EDS Field Servs.*, 879 F. Supp. 2d 1320, 1332 (M.D. Fla. 2012) ("The court only construes a contract against the drafting party if the contractual language is ambiguous.  Otherwise, the court applies the plain meaning of the contract.") (citations omitted).  At a minimum, TradeWinds' interpretation of the contractual language is a reasonable and rational interpretation, which casts doubt on the Plaintiff's breach of contract claim.  Based on the foregoing, therefore, Plaintiffs failed to demonstrate a likelihood of success on the merits of their breach of contract claim.

### ii.   Trademark Infringement

Likewise, Plaintiffs failed to establish a substantial likelihood of success on their trademark infringement claim.  To prevail on a trademark infringement claim, Plaintiffs must establish that (1) they possess a valid mark, (2) TradeWinds used the mark, (3) TradeWinds' use of the mark occurred "in commerce," (4) TradeWinds used the mark in connection with the sale or advertising of goods or services, and (5) TradeWinds used the mark in a manner likely to confuse consumers.  *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998) ("This Circuit has held that in order to prevail on a trademark infringement claim, a plaintiff must show that its mark was used in commerce by the defendant without the registrant's consent and that the unauthorized use was likely to deceive, cause confusion, or result in mistake.").  In arguing that Plaintiffs cannot prevail on their trademark infringement claim, TradeWinds contends that Plaintiffs failed to establish a likelihood of success in demonstrating a valid and enforceable mark, including priority in the "RUMFISH" mark, and that a likelihood of confusion exists.[9]  Based upon this record, Plaintiffs have failed to establish a likelihood of success on their trademark infringement claim because Plaintiffs have failed to demonstrate a likelihood of confusion as to the marks at issue.

### a.   Validity of the Mark

First, the parties dispute whether Plaintiffs can demonstrate the validity of Plaintiffs' mark.  As the parties recognize, registration establishes a rebuttable presumption that marks are either protectable or distinctive.  *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 n. 3 (11th Cir. 2007).  Indeed, 15 U.S.C. § 1057 provides:

---

[9]  TradeWinds does not set forth any argument disputing its use or intent to use the marks in commerce in connection with the sale or advertising of goods or services, so the analysis focuses on the remaining factors.

> A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

15 U.S.C. § 1057(b); *see also* 15 U.S.C. § 1115(a).  Plaintiffs provided evidence that they registered their "RUMFISH Y VINO" mark upon the principal register, but TradeWinds disputes the validity of that registration.

Specifically, Plaintiffs initially sought registration of the "RUMFISH Y VINO" service mark in October 2013 based on actual use, which was within months of being approached by the California company regarding expansion of the restaurant and bar (Solomon Decl., at ¶10 & Ex. N; Johnson Decl., at ¶4 & Ex. G).  The specimen attached to the application to establish actual use appears to indicate use of the "RUMFISH Y VINO" mark in Belize rather than the United States (Johnson Decl., Ex. G).  Nothing in the record indicates, and Plaintiffs do not dispute, that Plaintiffs did not actually use the mark in commerce in the United States at the time they filed the trademark application in October 2013.  In fact, RYV submitted a petition to the USPTO on May 8, 2014 to fix the "RUMFISH Y VINO" application based upon an intention to use rather than actual use, with the petition granted on August 7, 2014 (Solomon Decl., at ¶12 & Ex. N).  Despite indicating an intent to use in 2014, however, Plaintiffs did nothing with the mark until 2016, when JPL1 registered to conduct business in the United States on February 19, 2016; Plaintiffs registered the domain name for www.rumfishyvinoventura.com in October 2016; and JPL1 opened "RUMFISH y Vino" in Ventura, California in November 2016 (Solomon Decl., at ¶27; Johnson Decl., at ¶21 & Ex. L & M).  Prior to that, nothing in the record indicates that Plaintiffs possessed a bona fide intent to use the mark in commerce in the United States in 2014 or any other time before 2016.  Notably, it was not until January 17, 2017 that RYV's application for "RUMFISH Y VINO"

was registered as a service mark for bar and restaurant services and assigned U.S. Trademark Registration No. 5,124,613, with the first use and first use in commerce identified as November 8, 2016 (Solomon Decl., at ¶28 & Exs. A & S).

Additionally, Plaintiffs waited until April 11, 2014 to file a U.S. trademark application for the "RUMFISH" mark based on intent to use, which occurred around the same time that Plaintiffs learned that TradeWinds announced its plans to open "Guy Harvey's RumFish" in May 2014 (Solomon Decl., at ¶¶14 & 16 & Ex. O).  On April 24, 2014, TradeWinds received a letter from Plaintiffs regarding the opening of RumFish Grill and Plaintiffs' two pending trademark applications (Johnson Decl., at ¶6).  As noted, at that time, Plaintiffs premised the "RUMFISH Y VINO" application upon actual use in the United States and the "RUMFISH" mark upon intent to use in the United States.  Not until *after* the parties began negotiating the Agreement and *after* TradeWinds submitted its trademark application for "RUMFISH GRILL" did Plaintiffs petition the USPTO to amend their application for "RUMFISH Y VINO" to properly indicate intent to use.

On the other hand, on January 16, 2015, TradeWinds filed its application for the trademark and service mark "RUMFISH GRILL" for restaurant and bar services, clothing, and drinkware, including shot glasses, cups, and drink glasses, claiming a first use in commerce date of June 2, 2014 (Solomon Decl., at ¶25 & Ex. R).  On October 13, 2015, TradeWinds' application for "RUMFISH GRILL" was registered as a trademark and service mark for restaurant and bar services and clothing and assigned U.S. Trademark Registration No. 4,832,829 (Solomon Decl., Ex. B).  As indicated, the "RUMFISH GRILL" trademark registration indicates that the first use of the mark occurred on February 7, 2014 and that the first commercial use of the mark occurred on June 2, 2014 (Solomon Decl., Ex. B).

Notably, "[b]ecause a bona fide intent to use the mark in commerce is a statutory requirement of a valid intent-to-use trademark application under Section 1(b), the lack of such intent is a basis on which an opposer may challenge an applicant's mark." *M.Z. Berger & Co., Inc. v. Swatch AG*, 787 F.3d 1368, 1375 (Fed. Cir. 2015).  Such intent must be demonstrable and more than a mere subjective belief on the part of the applicant.  *Id.*  Rather, such intent must be assessed on an objective basis and the intent to use the mark in commerce must appear firm. *Id.* at 1376.  Given the lack of any objective supporting evidence in the record of Plaintiffs' bona fide intent to use their marks in commerce in the United States prior to TradeWinds' use, TradeWinds asserts that it maintains a legitimate basis on which it can challenge Plaintiffs' mark, which, at a minimum, calls into question Plaintiffs' substantial likelihood of success on its trademark infringement claim.

Further, Plaintiffs highlight their use of the "RUMFISH Y VINO" mark in 2008 in Belize and articles referencing the Belize restaurant and bar as establishing rights under the Lanham Act (Solomon Decl., at ¶¶6-7 & Ex. D &E).  Plaintiffs further argue that their use of an active website and Facebook page in conjunction with their restaurant and bar in Belize, which includes activity as early as April 2010, provide further support for their superior rights in the mark (Solomon Decl., at ¶9 & Ex. F).  Plaintiffs' reliance upon their activities in conjunction with their restaurant and bar in Belize is misplaced, however.  Such foreign use of a mark cannot establish priority in the United States.  *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568-69 (Fed. Cir. 1990) ("Such foreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here.  The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme.") (internal citations and citations omitted).

Notwithstanding, Paragraph 3 of the Agreement does state that TradeWinds ". . . agrees that it will not challenge the validity or ownership of RYV's Marks in the United States." (Solomon Decl., Ex. C).  Curiously, neither party directly addressed this provision of the Agreement and how it should impact the Court's analysis.  TradeWinds' validity argument is persuasive, and casts doubt at this stage as to the Plaintiffs' likelihood of success of establishing a valid mark.  Given the uncertainty as to the applicability of Paragraph 3 regarding TradeWinds' challenge to the validity of Plaintiffs' Marks, a finding regarding validity is unnecessary because Plaintiffs are unable to establish a likelihood of confusion on this record.

### b.      Likelihood of Confusion

The parties dispute whether a likelihood of confusion exists.  As an initial matter, in the Agreement, the parties explicitly agreed that their use of "RUMFISH y vino" and "RumFish Grill" marks in relation to restaurant and bar services created no likelihood of confusion and that, to the best of their knowledge, no actual confusion existed between their respective marks at that time (Solomon Decl, Ex. C, at ¶5).  Plaintiffs now contend, however, that TradeWinds use of "RUMFISH" marks (or at least use of "RUMFISH" marks without the term "GRILL") to describe entirely different goods and services would create a likelihood of confusion.  In determining whether a likelihood of confusion exists, a court considers the following seven factors:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion.

*N. Am. Med. Corp.*, 522 F.3d at 1220 (citation omitted); *see also Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010).

### 1.      Strength of Plaintiffs' Mark

The strength and distinctiveness of a plaintiff's mark constitutes a vital consideration in determining the scope of protections accorded to such mark.  *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir. 1983).  "The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (citation omitted).    Here, Plaintiffs argue the "RUMFISH" mark is strong.  TradeWinds does not disagree. TradeWinds contends that both parties use and have been using variations of "RUMFISH" in the United States, and, therefore, TradeWinds does not contest the strength of the "RUMFISH" mark.  This factor thus weighs in favor of Plaintiffs.

### 2.      Similarity between Marks

Determination of the similarity of the marks involves considering the overall impression created by the marks as a whole rather than a simple comparison of the individual features of the marks.  *John H. Harland*, 711 F.2d at 975 (citation omitted).   "Relevant points of comparison include the appearance, sound and meaning of the marks, as well as the manner in which the marks are used."  *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1260 (11th Cir. 2016) (citation and internal quotation marks omitted).  The marks need not be identical to support a finding of likelihood of confusion; instead, the important question remains where the marks are sufficiently similar to deceive the public.  *Id.* (citation omitted).

Plaintiffs argue that TradeWinds made nearly identical use of Plaintiffs' "RUMFISH" mark as the primary and dominant portion of each of its announced rebranding efforts. TradeWinds asserts that, although the marks "RUMFISH BEACH RESORT," "RUMFISH CHARTERS," and "RUMFISH BEACH LIFE" (the "'RUMFISH BEACH AND FISHING' Marks") all contain the term "RUMFISH," the other terms differentiate the marks. Namely,

TradeWinds contends that Plaintiffs' "Y VINO," translating to "and wine," denotes a restaurant and wine bar, while "BEACH RESORT," "CHARTERS," and "BEACH LIFE" suggest beach-related activities.  TradeWinds also argues that it uses all the "RUMFISH BEACH AND FISHING" Marks in connection with the TradeWinds name, such as RumFish Beach Resort at TradeWinds.  Further, TradeWinds asserts that it has operated the TradeWinds Resort in St. Petersburg, Florida since 1986 and that the TradeWinds Resort is the largest resort on the west coast of Florida, so any consumers visiting the TradeWinds Resort in St. Petersburg, Florida would not confuse the TradeWinds name with a single restaurant and wine bar in Ventura, California thousands of miles away (Overton Decl., at ¶18).  Indeed, although the RUMFISH BEACH AND FISHING" Marks use the term "RUMFISH," the terms "BEACH RESORT," "CHARTERS," and "BEACH LIFE" differentiate the marks sufficiently enough to not create any confusion.  Furthermore, the marks will be used in relation to entirely different goods and services and remain sufficiently dissimilar to not create any likelihood of confusion. Accordingly, this factor weighs in favor of TradeWinds.

### 3. Similarity between Products and Services

As to the similarity between the products and services, the greater the similarity, the greater the likelihood of confusion.  *John H. Harland*, 711 F.2d at 976 (citation omitted).  To that end, this factor involves a determination as to whether the products or services are the kind that that public attributes to a single source rather than whether the purchasing public can readily distinguish between the products or services of the respective parties.  *Frehling Enters., Inc.*, 192 F.3d at 1338 (citation omitted).  The focus of this inquiry centers upon the reasonable belief of the average consumer regarding what the likely source of the goods is.  *Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1261 (citation omitted).

In this instance, Plaintiffs contend that both parties engage in the "hospitality trade" inclusive of bar, restaurant, hotel, and resort services.  Plaintiffs' paint with too broad a brush, however.  Instead, as TradeWinds argues, Plaintiffs' restaurant and bar services remain distinctly different from the services TradeWinds seeks to provide with the disputed marks, including a large beach resort and fishing charters.  The average consumer utilizing the TradeWinds resort or any of the services it intends to offer in St. Petersburg, Florida would not reasonably believe that the source of the beach resort, fishing charters, and apparel involved a single restaurant located in Ventura, California.  As such, this factor weighs in favor of TradeWinds.

### 4.      Similarity of Sales Methods

With respect to the similarity of sales methods, any dissimilarities between the retail outlets for and the predominant customers of the parties lessen the possibility of confusion, mistake, or deception.  *Frehling Enters.*, 192 F.3d at 1339 (citation omitted).  When considering this factor, the court should consider where, how, and to whom the parties sell their products or services.  *Id.* (citations omitted).  Though direct competition between the parties need not exist for this factor to weigh in favor of a likelihood of confusion, some evidence that the parties' products or services are sold in the same stores and some degree of overlap between the parties' outlets and customer bases should be present.  *Id.* (citations omitted).

Plaintiffs asserts that the parties compete for the same customers in the same channels of distribution – tourists visiting tourist destinations.  In contrast, TradeWinds contends that Plaintiffs service customers in Ventura, California looking for a restaurant and bar, while TradeWinds services customers seeking a beach resort and vacation destination in Florida.  TradeWinds further argues that the expansive geographical gap between the Ventura, California

location of Plaintiffs' restaurant and bar and the TradeWinds Resort in St. Petersburg, Florida causes this factor to weigh heavily in favor of TradeWinds.

As TradeWinds asserts, few, if any, customers seeking a bar and restaurant in or near Ventura, California will also seek a beach resort and fishing charter services in St. Petersburg, Florida. The sheer distance between the two, alone, makes it highly unlikely that Plaintiffs and TradeWinds target or market to the same or even similar customers. Given the lack of similarity of sales methods to customers, this factor weighs in favor of TradeWinds.

### 5. Similarity of Advertising Methods

Regarding the similarity of advertising methods, the greater the similarity in the parties' advertising campaigns, the greater the likelihood of confusion. *John H. Harland*, 711 F.2d at 976 (citation omitted). Essentially, the court must compare the parties' advertisements and the audiences they reach. *Fla. Int'l Univ. Bd. of Trustees*, 830 F.3d at 1262 (citation omitted). Identification of advertising methods is not required; rather, the standard considers whether significant enough overlap in the audience of the advertisements exists that a possibility of confusion could result. *Id.*

In this instance, Plaintiffs contend that the parties use the same forms of media and promotional strategies, including a website, Facebook page, and internet advertising, to target the same types of consumers. TradeWinds asserts that, although Plaintiffs and TradeWinds use similar advertising methods, including websites and social media, such advertising media are too common to support a likelihood of confusion. Specifically, TradeWinds argues that the target markets for the advertising differ significantly, with Plaintiffs advertising targeting customers in and around Ventura, California, but TradeWinds advertising nationwide with a primary focus on customers located within Florida.

In this instance, neither party provided evidence of any of their advertisements to customers but simply contend that they both use the internet to target consumers, with TradeWinds essentially arguing that such advertising is too common.  Though neither party sufficiently addressed this factor, the undersigned tends to agree that the simple fact that both entities maintain information on the internet through websites or Facebook, for instance, does not lead to the conclusion that significant overlap in the parties' audiences exists that would create a possibility of confusion.  Further, as TradeWinds notes, the fact that the parties maintain separate and distinct websites and Facebook pages would tend to inform a consumer that the entities operated independent of one another.  *See Tana*, 611 F.3d at 778 ("Thus, the only similarity in the advertising channels used by the two parties is their maintenance of websites on the World Wide Web.  This similarity would dispel rather than cause confusion, however, because the websites are separate and distinct, suggesting two completely unrelated business entities.").  This factor thus weighs in favor of TradeWinds.

### 6.   TradeWinds' Intent

As to a defendant's intent, if a plaintiff can demonstrate that a defendant adopted a mark with the intent of deriving benefit from the reputation or goodwill of the plaintiff, that fact alone may sufficiently justify the inference that confusing similarity exists.  *Frehling Enters., Inc.*, 192 F.3d at 1340 (citation omitted).  In this context, bad faith in the adoption and use of a trademark typically involves efforts by a party to pass off its products or services as that of another.  *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order*, 809 F.3d 1171, 1188 (11th Cir. 2015).  Plaintiffs assert that TradeWinds acted in bad faith because TradeWinds could only have come up with the "RUMFISH" term by copying Plaintiffs' prior creation and use.  In making such assertion,

Plaintiffs rely on "evidence" placing partners of Guy Harvey and TradeWinds in Plaintiffs' "Rumfish y vino" restaurant in Belize less than a year before TradeWinds' earliest use of its "RUMFISH" mark.  The purported "evidence" upon which Plaintiffs rely consists of conjecture and speculation regarding a man named Hugh Darley and some presumed connection between him, Norwegian Cruise Lines, and Guy Harvey, which later led to a supposed suggestion by Mr. Darley to TradeWinds regarding use of the "RUMFISH" term (Solomon Decl., at ¶¶13-15).

TradeWinds explicitly contradicts such "evidence" (Overton Decl., at ¶¶6-11 & Ex. A).  Indeed, TradeWinds provided an e-mail from February 2013 indicating that it considered the name "RUMFISH" as a potential moniker for its restaurant at the Guy Harvey Outpost (Overton Decl., Ex. A).  Such e-mail precedes the initial meeting between Plaintiffs and Mr. Darley in the fall of 2013 by several months (Solomon Decl., at ¶13).  Furthermore, TradeWinds asserts that it had no knowledge of Mr. Darley prior to this lawsuit and no awareness of any restaurants or businesses named "RUMFISH" or that Plaintiffs' Rumfish y vino restaurant and bar operated in Belize at the time that it selected the name RumFish Grill for its new restaurant (Overton Decl., at ¶¶9-10).  Beyond that, TradeWinds asserts that, at the time it selected its mark in 2013, to the best of its knowledge, no other U.S. trademark filings using any "RUMFISH" mark existed (Overton Decl., at ¶11).

Moreover, TradeWinds argues that it used the "RUMFISH GRILL" mark in good faith since early 2014 and, solely based on the success of its own use of the "RUMFISH GRILL" mark, sought to use the "RUMFISH BEACH AND FISHING" Marks (Overton Decl., at ¶18).  At no time did TradeWinds seek to trade off the goodwill of Plaintiffs' "RUMFISH Y VINO" mark.  Plaintiffs certainly fail to establish any basis for a finding that TradeWinds, the largest resort on the west coast of Florida operating since 1986, would seek to piggyback on the

goodwill associated with a single restaurant opened in Ventura, California in 2016.  Given the foregoing, Plaintiffs' failed to establish that TradeWinds acted in bad faith or otherwise with any sort of nefarious intent.  As such, this factor weighs heavily in favor of TradeWinds.

### 7.      Actual Confusion

Actual confusion in the consuming public remains the most persuasive evidence in assessing likelihood of confusion.  *Tana*, 611 F.3d at 779 (citation omitted).  Though evidence of actual confusion between trademarks is not strictly necessary for a court to find a likelihood of confusion, it remains the best such evidence.  *E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985) (emphasis removed).  Plaintiffs argue that they seek to prevent inevitable actual confusion from occurring but do not argue that any actual confusion yet occurred.  As TradeWinds contends, nothing in the record indicates that any actual confusion occurred or that any actual confusion likely will occur if an injunction does not issue.  As TradeWinds notes, Plaintiffs and TradeWinds coexisted continuously in the restaurant and bar industry for years without any known actual confusion between Rumfish y vino and RumFish Grill.  To now claim that the "RUMFISH BEACH AND FISHING" Marks, which pertain to completely separate and distinct goods and services, would somehow cause confusion between Plaintiffs restaurant and bar and the TradeWinds Resort and charter fishing services, or that the addition of the term "GRILL" to the new marks would make some sort of material difference, lacks merit.  Accordingly, this factor weighs heavily in favor of TradeWinds.

In sum, when balancing all the factors, the balance tips in favor of TradeWinds.  Based on the foregoing, therefore, Plaintiffs failed to demonstrate a likelihood of success on the merits of their trademark infringement claim.  This prong of the analysis therefore does not support entry of a preliminary injunction.

### iii.     False Designation of Origin

The Lanham Act also creates causes of action for false designation of origin.  Pursuant to Section 43(a) of the Lanham Act, individuals are prohibited from using in commerce, in connection with the sale of goods or services, any word, term, name, symbol, or device, or combination thereof, or any false designation of origin which (1) will likely cause confusion or mistake or deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person or (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.  15 U.S.C. § 1125(a)(1).  To prevail on a claim under Section 43(a), Plaintiffs must demonstrate (1) they possessed trademark rights in the mark or name at issue and (2) the other party adopted the same or a confusingly similar mark such that consumers were likely to confuse the two.  *Tana*, 611 F.3d at 773.

As with Plaintiffs' trademark infringement claim, given the ambiguity in the record, the Court is unable to make a finding regarding whether Plaintiffs can establish a likelihood of success regarding whether they possess valid trademark rights in the marks.  Regarding the likelihood of confusion prong, the court uses the same seven-factor test as for infringement. *See id.* at 774-75 (noting a court applies a multi-factor test evaluating the following seven factors when determining likelihood of confusion: "(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.").  Again, as

noted above, Plaintiffs failed to establish a likelihood of confusion under the seven-factor test. As with the trademark infringement claim, Plaintiffs failed to establish a likelihood of success on the merits of their false designation of origin claims.  Accordingly, this prong of the analysis does not support entry of a preliminary injunction on this claim.

### B.   Irreparable Harm

As a prerequisite to the entry of a preliminary injunction, the party seeking a preliminary injunction must also establish it will suffer irreparable harm unless the injunction issues.  *See Siegel*, 234 F.3d at 1176.  Even if Plaintiffs could establish a substantial likelihood of success on the merits, the absence of a substantial likelihood of irreparable harm to Plaintiffs, standing alone, precludes entry of a preliminary injunction.  *Id.* ("Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").  Indeed, irreparable harm is "the sine qua non of injunctive relief."  *Id.* (citations and quotation marks omitted).

In the context of a preliminary injunction, the asserted irreparable harm must be actual and imminent rather than remote or speculative.  *Id.*  Where a party makes a sufficiently strong showing of likelihood of confusion caused by trademark infringement, that may, by itself, constitute a showing of a substantial threat of irreparable harm.  *Davidoff & CIE, S.A. v. PLD Intern. Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001) (citations omitted).  Other grounds for irreparable harm in the context of a trademark infringement action include loss of control of reputation, loss of trade, and loss of goodwill.  *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (citations omitted).  Though economic losses alone will not justify entry of a preliminary injunction, the loss of customers and goodwill constitutes an

irreparable injury.  *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (citation omitted).

Here, Plaintiffs contend that they will suffer irreparable harm in the form of confusion and erosion of their trade identity rights (Solomon Decl., at ¶35) and general and consequential damages, including loss of the benefit of their contract, loss of sales, loss of future earnings, and injury to the goodwill in their trademarks, in an amount believed to exceed $75,000 (Doc. 1, at ¶48; Doc. 17, at 21).  TradeWinds argues that Plaintiffs will suffer no irreparable harm as the potential diversion or loss of customers does not exist, since customers seeking the restaurant in Ventura, California would not be diverted to a resort in St. Petersburg, Florida thousands of miles away.  Furthermore, TradeWinds contends that the parties coexisted using the "RUMFISH" marks for more than two years without any known confusion and that the addition of the term "GRILL" to the "RUMFISH BEACH AND FISHING" Marks would not alter the situation significantly, as Plaintiffs suggest.

As with the other factors, Plaintiffs failed to establish irreparable harm.  Mainly, given Plaintiffs' failure to establish any actual confusion or even a substantial likelihood of success on the likelihood of confusion between Plaintiffs' "RUMFISH y vino" mark and the "RUMFISH BEACH AND FISHING" Marks, their argument that any erosion to their trade rights, injury to their goodwill, or loss of current or future revenue falls flat.  Additionally, in his demand letter to TradeWinds, DiNardo specifically sets out a method for ascertaining the monetary damages Plaintiffs suffered as a result of any "RUMFISH" marks used by TradeWinds not in conjunction with or immediately followed by the term "GRILL" (DiNardo Decl., Ex. I).  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (citation omitted). Plaintiffs' suggestion that monetary damages could compensate them for any harm suffered as

a result of TradeWinds' use of "RUMFISH" marks not consistent with the Agreement and specific demand to TradeWinds for such compensation weighs against a finding that the harm Plaintiffs will suffer if an injunction does not issue is irreparable.  Based on the foregoing, Plaintiffs failed to demonstrate that they will suffer irreparable harm, and, thus, this prong of the analysis also does not support entry of a preliminary injunction.

### C.      Balance of harm

A party seeking a preliminary injunction must further demonstrate that the threatened harm to it outweighs the harm a preliminary injunction may cause to the opposing party.  *Siegel*, 234 F.3d at 1176.  As the Eleventh Circuit cautions, courts should exercise great care before the entire case has been fully and fairly heard to assure that the power of the court to require or deter action does not result in unwarranted harm to the defendant or the public.  *Ala. v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).  Here, Plaintiffs contend that they are suffering and will continue to suffer diversion of customers, loss of the ability to control their reputation, and potential injury to the "RUMFISH y vino" brand, while TradeWinds possesses no legally protectable interests in continuing to misappropriate the "RUMFISH y vino" brand in the context of their rebranded hotel and resort property or to otherwise trade on the goodwill of Plaintiffs.  Interestingly, however, Plaintiffs fail to point to a single customer or sale lost or diverted to TradeWinds or any damage to their reputation or brand caused by TradeWinds' use of the "RUMFISH GRILL" mark.

In contrast, TradeWinds asserts that the balance of harm strongly favors it.  Namely, TradeWinds argues that Plaintiffs' potential loss of customers is non-existent and the potential damage to Plaintiffs' goodwill is remote, speculative, and highly unlikely, whereas the harm suffered by TradeWinds in having to rebrand during the pendency of this lawsuit is actual and severe.  TradeWinds contends that rebranding would require significant marketing, advertising,

and market testing and would completely shut down the resort thereby leading to a significant loss in income and damage to TradeWinds' goodwill.  According to TradeWinds, the estimated cost to rebrand would total $116,396.67, inclusive of costs associated with signage, décor, third-party design fees, website design, welcome maps, uniforms, telephone cards, TripAdvisor cards, 4x4 truck wraps, bar crawl passports, retail counter wrap, artwork, murals, viewing area wrap, television channel cards, and wall hooky (Overton Decl., at ¶27).   Additionally, TradeWinds estimates the damage to its goodwill and the loss of revenue would total at least $250,000 (Overton Decl., at ¶27).  Overall, TradeWinds asserts that they will suffer monetary damages and loss of reputation in goodwill in the amount of $366,396,67.

Comparing the harm suffered by the parties in this instance, the balance of harm tips in favor of TradeWinds.  As TradeWinds contends, the potential loss of customers or goodwill for Plaintiffs appears remote and speculative, at best, and does not outweigh the costs of delay that TradeWinds will suffer in having to rebrand products and services completely unrelated to the restaurant and bar services.  Given the lack of harm to Plaintiffs and the significant harm to TradeWinds, Plaintiffs failed to show that the threatened harm to them outweighs the harm a preliminary injunction may cause to TradeWinds.  As such, the balance of harm weighs against entry of a preliminary injunction.  For that reason, a preliminary injunction should not issue.

### D.    Public Interest

Finally, Plaintiffs must demonstrate that the preliminary injunction would not disserve or be adverse to the public interest.  *Siegel*, 234 F.3d at 1176.  In a trademark infringement case, the public interest is served by preventing consumer confusion in the marketplace.  *Davidoff*, 263 F.3d at 1304 (finding entry of a preliminary injunction regarding trademark infringement served the public interest by preventing consumer confusion in the marketplace).   In this context, courts should also consider the public's interest in encouraging rather than stifling

34

competition and the broader implications of the grant of a preliminary injunction. *Uber Promotions, Inc. v. Uber Tech., Inc.*, 162 F. Supp. 3d 1253, 1281 (N.D. Fla. 2016) (citations omitted). Additionally, in a breach of contract case, the public interest involves the enforcement of valid contracts. *See, e.g., Developers Sur. and Indemn. Co. v. Bi-Tech Const., Inc.*, 964 F. Supp. 2d 1304, 1310 (S.D. Fla. 2013).

Plaintiffs assert that entry of a preliminary injunction would serve the public interest because it would protect the public from being misled as to the source of goods and services. TradeWinds, however, contends that entry of a preliminary injunction would prove adverse to the public interest because Plaintiffs do not use their "RUMFISH y vino" mark in conjunction with a beach resort, fishing charters, or clothing; Plaintiffs' trademark registration is unenforceable; TradeWinds used its "RUMFISH" mark in the United States years prior to Plaintiffs' use; and the chances of consumer confusion remain remote as Plaintiffs operate a restaurant in Ventura, California thousands of miles from the TradeWinds Resort in St. Petersburg, Florida.

Here, the public interest would not be served by enforcing an unreasonable interpretation of contract terms or in preventing TradeWinds from using "RUMFISH" marks in a way that is not likely to create any confusion. Rather, the public interest would be disserved by unreasonably holding a party to terms it did not agree to in a contract and by precluding an entity from using marks relating to distinctly different goods and services that could not be confused for another party's services. Accordingly, the public-interest considerations weigh against entry of a preliminary injunction.

## IV.    Conclusion

As noted, a preliminary injunction is an extraordinary remedy to be used only when a moving party carries its burden as to the four prerequisites.  *See Four Seasons*, 320 F.3d at 1210.  Plaintiffs failed to carry that burden in this instance.  Accordingly, it is hereby

RECOMMENDED:

1.  Plaintiffs' Motion for Preliminary Injunction (Doc. 17) be DENIED.

IT IS SO REPORTED in Tampa, Florida, this 24th day of April, 2019.

ANTHONY E. PORCELLI
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

cc:    Hon. Charlene E. Honeywell
       Counsel of Record